UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDWARD CASEY, TINA CASEY, MICHELLE YAMEEN, and LAWRENCE A. STIGAS<br><br>Plaintiffs,<br><br>v.<br><br>PUTNAM INVESTMENT MANAGEMENT, LLC,<br><br>Defendant. | Civil Action No. 03 CV 12273 RCL<br><br>COMPLAINT MAGISTRATE JUDGE Bowler<br><br>JURY TRIAL DEMANDED |

51759
AMOUNT $150
SUMMONS ISSUED yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. F.O.M.
11/17/03

Plaintiffs bring this complaint based upon information and belief, except for their own actions, which are based upon personal knowledge. Their information and belief are based upon the investigation of their counsel, which included a review of complaints filed by the Commonwealth of Massachusetts and by the United States Securities and Exchange Commission ("SEC") concerning the conduct at issue in this action, as well as of other regulatory filings and complaints, press releases and media reports.

## NATURE OF THE ACTION

1. This is a direct shareholder action for violation of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq*. Defendant Putnam Investment Management, LLC ("Putnam") is the investment advisor for the Putnam family of funds ("Putnam Funds"), a position it held during the relevant time period complained of herein. Putnam has entered into investment advisory agreements with each of the funds, pursuant to which it has earned, and continues to earn, millions of dollars of fees each year.

Plaintiffs own shares in a number of the Putnam Funds, as detailed below.

2. Putnam procured these lucrative agreements without disclosing that its senior executives had been engaged in "market timing" transactions in fund shares, for their own personal benefit and for the benefit of certain favored clients. "Market timing" transactions are short-term trades in and out of a mutual fund, for the purpose of exploiting idiosyncracies in the way mutual funds price their shares. Market timing transactions benefitted individual managers of the funds, and Putnam's favored clients, at the expense of the funds and the rest of their investors. Since 1998, Putnam and its favored customers have reaped millions of dollars of secret and illegal profits through these illicit transactions.

3. Recent investigations by federal and state authorities have discovered not only that these types of trades occurred, but also that Putnam senior management has been well aware of them since at least 2000, but failed to stop them. Putnam also failed to notify the funds and their shareholders that such trading was occurring. Instead, it continued to issue assurances that effective procedures were in place to detect and prevent such trading.

4. Section 15(a) of the ICA, 15 U.S.C. § 80a-15(a), requires that all investment advisory contracts must contain a precise description of all compensation to be paid thereunder and be initially approved by a majority of fund shareholders. The contracts can thereafter be extended either by vote of the board of directors of the fund or of the shareholders. Section 20(a), 15 U.S.C. § 80a-20(a), requires that all proxy statements issued must comply with the proxy rules issued by the Securities and Exchange Commission whose rules prohibit misstatements of material facts and failures to disclose facts that renders misleading the information that actually was disclosed. By misleading both the boards and the shareholders concerning the existence of "market timing" and other improper practices when it negotiated its advisory

contract, Putnam violated section 20(a) of the ICA.

5. Putnam also violated section 36(b) of the ICA, 15 U.S.C. § 80a-35(b). That provision imposes a fiduciary duty on investment advisors with respect to all fees earned by them and their affiliates and, at a minimum, required Putnam to disclose all material facts to fund directors concerning the competence and integrity of the individuals who would be managing fund portfolios, and concerning the sufficiency of procedures to assure proper management of each fund.

6. Because the approval of defendant's investment advisory agreements was obtained in violation of the ICA, those agreements should be rescinded and/or declared unenforceable or void, pursuant to § 47(b) of the ICA, and all fees received during the past year should be refunded to the funds.

7. The seriousness of Putnam's breach of trust can hardly be overstated. Both the SEC and the Secretary of State of the Commonwealth of Massachusetts have commenced actions. The Commonwealth filed an Administrative Complaint against Putnam and two of its employees on October 28, 2003. The SEC, that same day, filed a Complaint against those two same employees and instituted administrative proceedings against Putnam seeking relief in the form of a cease-and-desist order, disgorgement, penalties, and other equitable remedies. The New York State Attorney General has announced that his office is also currently investigating the wrongs alleged here. The United States Attorney's Office in the Southern District of New York has served a subpoena on Putnam and its affiliates as well. Putnam's actions are part of a national scandal that is threatening to engulf the entire mutual fund industry.

8. Since public disclosure of these practices starting on October 21, 2003, customers who have been relying on Putnam for decades have been deserting the firm in droves.

- On October 31, 2003, *The Wall Street Journal* reported that New England Pension Consultants, an influential adviser, recently sent out an alert to 190 institutional clients telling them to terminate Putnam as an international stock fund manager and put all other Putnam products "on hold." Wilshire Associates, another institutional investor consultant, told clients it was likely to make the same recommendation, and Morningstar, Inc., is considering such a move as well.
- The office of Treasurer for the Commonwealth of Massachusetts has announced that it has fired Putnam as manager of $1.74 billion in its retirement plans, publicly stating that "we have to have confidence in the people we are paying large fees to manage our money and, at this point, we do not have that level of confidence in Putnam."
- New York, Vermont, Rhode Island, Iowa and Pennsylvania have all terminated their relationships with Putnam; and Connecticut, Oregon, Washington and Florida are considering terminating their relationship with Putnam as well.
- California State Treasurer Phil Angelides called on the California Public Employees' Retirement System and the California State Teachers' Retirement System to terminate contracts with Putnam, which oversees $1.5 billion for the two pensions; according to Angelides: "Putnam has failed to meet the standards that we, as fiduciaries, should expect from a firm handling billions of dollars on behalf of pensioners and taxpayers."
- In all, over $10 billion dollars have been withdrawn from Putnam's charge in the

less than two weeks since the wrongdoings were first disclosed, an amount and duration which Burton Greenwald, an industry consultant in Philadelphia, described as "unparalleled" and "extraordinary."

9. Had defendant disclosed its improper activities to fund directors and shareholders, the boards and shareholders would have elected to terminate their relationship with Putnam and would have refused to approve or extend any further management contracts with Putnam.

10. On November 3, 2003, Jeffrey W. Greenberg, Chairman and Chief Executive Officer of Marsh & McLennan Companies, Inc., the ultimate parent corporation of Putnam, announced the removal of Lawrence Lasser as President and Chief Executive Officer of Putnam, positions Lasser had held since 1986.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43; and 28 U.S.C. § 1331.

12. Venue is proper in this District pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, since many of the acts took place in this District.

13. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the acts, practices and courses of business alleged herein.

## PARTIES

14. Plaintiff Edward Casey owns share or units of Putnam Vista Fund.

15. Plaintiff Edward Casey and Tina Casey own share or units of Putnam Voyager Fund.

16. Plaintiff Michelle Yameen owns share or units of Putnam Tax Smart Equity Fund and

Putnam Vista Fund.

17. Plaintiff Trustee Lawrence A. Stigas Roth IRA owns share or units of Putnam Capital Opportunities Fund.

18. Each of the funds, of which plaintiffs hold shares or units, identified above ("Plaintiffs' Funds") is a mutual fund that is regulated by the ICA and is managed by defendant Putnam, pursuant to investment advisory contracts.

19. Defendant Putnam Investment Management LLC ("Putnam"), is a Massachusetts Business Trust registered in 1971 and an investment advisor under the Investment Advisers Act of 1940. Putnam is an indirect wholly-owned subsidiary of Putnam Investment Management Trust, which is an indirect wholly-owned subsidiary of Marsh & McLennan Companies, Inc. ("MMCI"). MMCI is a publicly-owned holding company traded on the New York Stock Exchange, whose operating subsidiaries are international insurance brokers, investment managers, and management consultants. Putnam is, and was during the relevant period, the investment adviser for the Putnam Funds and is the sub-adviser to 38 unaffiliated institutional portfolios. As of September 30, 2003, Putnam managed approximately $272 billion and has ultimate responsibility for overseeing the day-to-day management of the Putnam Funds. Putnam's headquarters are located at One Post Office Square, Boston, Massachusetts.

20. Certain Putnam managers, although not defendants here, have been identified as being directly implicated in the improper transactions identified in this complaint.

(a) Justin M. Scott was head of Small and Mid-Cap Core Fund and Small and Mid-Cap Growth Fund. He was also Portfolio manager of Vista Fund and Team member of Mid-Cap Growth Team 2.

(b) Omid Kamshad served as managing director and chief investment officer of International

Equities. He was Portfolio leader for the International Equity Fund and Europe Equity Fund; and team member for International Core Team, International Growth Team and International Value Team.

(c) Geir Lode was Portfolio Manager of Global Core Equities.

(d) Carmel Peters was Director of Emerging Markets Equities and a team member of International Core Team.

21. On October 28, 2003, the Commonwealth of Massachusetts filed an administrative complaint against Putnam, Scott and Kamshad, which accused them of engaging in a persistent pattern of market timing Putnam's Voyager Fund, Europe Growth Fund, International Growth Fund, Global Equity Fund and other Putnam Funds. It alleged that top management at Putnam knew about these trades but "turned a blind eye and failed to take any remedial action." On the same day, the SEC filed two actions in the District of Massachusetts, against these same two individuals and Putnam. Notably, the SEC charged that Putnam, although well aware of these market timing violations since 2000, failed to provide this information to any of the directors of the mutual funds Putnam was advising, who were being asked to vote upon and approve the investment advisor agreements with Putnam.

## SUBSTANTIVE ALLEGATIONS

### Background

22. A mutual fund is an investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, or other securities. Shareholders purchase mutual fund shares from the fund itself (or through a broker for the fund), but are typically not able to purchase the shares from other shareholders on a secondary market, such as the New York Stock Exchange or Nasdaq. The price investors pay for mutual fund shares is the fund's per share net asset value

("NAV"), calculated by the fund each day, based on the market value of the securities in the fund's portfolio, plus any shareholder fees that the fund imposes at purchase (such as sales loads). Mutual fund shares are "redeemable," meaning that when mutual fund shareholders want to sell their fund shares, they sell them back to the fund (or to a broker acting for the fund) at the fund's NAV, minus any fees the fund imposes at that time (such as deferred sales loads or redemption fees).

23. The investment portfolios of mutual funds are managed by separate entities known as "investment advisers" that are registered with the SEC. Investment advisers are retained by the mutual fund companies pursuant to a contract which, among other things, details the compensation to be provided by the fund to the adviser. *See* ICA § 15(a), 15 U.S.C. § 80a-15(a). These contracts must be approved by the vote of a majority of the outstanding voting stock of the fund. This is done at the appropriate time through the issuance by the fund of a proxy statement, indicating the need to engage in such a contract or, as the time might require, amend or renew the contract. The issuance of proxy statements is governed by the federal securities laws and the rules promulgated thereunder by the SEC. *See* ICA § 20(a), 15 U.S.C. § 80a-20(a). Advisory contracts can be extended either by vote of the fund's board of directors or by the shareholders of the fund. *See* ICA §15(a), 15 U.S.C. § 80a-15(a).

24. A fund's investment adviser generally employs portfolio managers, who have discretion to buy and sell securities in the fund's portfolio. Portfolio managers must make investment decisions in accordance with the fund's objectives as stated in the fund's prospectus and cannot make investment decisions that are in their own interests rather than in the interests of the fund's shareholders. Portfolio managers, as investment advisers, owe a fiduciary duty to fund shareholders of utmost good faith, and full and fair disclosure of all material facts.

**The Lure And Evils Of Market Timing**

25. Securities that trade on exchanges can change price at any time during the trading day, in reaction to relevant information as it becomes available. By contrast, mutual funds are priced only once per day, at 4:00 p.m. Eastern Time, at the close of the major New York markets. At that time mutual funds calculate their NAVs, based on the closing market prices of the securities held in the funds' portfolios. Many funds, and in particular many funds specializing in foreign stocks, calculate their daily prices hours after the closing of the foreign markets, many of which are in different time zones that may be 5-14 hours ahead of Eastern Standard Time. In some instances, information that may be highly relevant to the pricing of those foreign securities becomes available after those foreign markets have closed, but before 4:00 p.m. Eastern Time. In pricing fund shares for that day, the funds will use the hours-old closing prices of foreign shares held by the fund, even though it may by then be apparent that the price of those shares is likely to rise the following day.

26. This situation creates an opportunity for sophisticated institutions and insiders to take advantage of this time lag by buying funds, at the current day's closing price, and selling them the following day or shortly thereafter, after the foreign market has reacted to the new information, bolstering the fund's NAV. Because shares traded on foreign markets close hours ahead of the New York markets, international funds are often the target of market timers. To be in a position to take advantage of market timing opportunities, however, an investor must know what foreign securities are heavily represented in a given fund's portfolio on any given day. Such information is typically available only to the managers of the fund.

27. Market timing is harmful to long-term fund shareholders, because it increases the fund's

transaction costs and siphons off a portion of the profits that otherwise would flow solely to those shareholders. It can also disrupt the fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance. In short, market timing benefits a select few at the expense of the fund and all other fund shareholders.

28. Putnam was well aware of the evils of market timing. In 1996, in response to increasing damage to the performance and value of its mutual funds by speculators, market timers and arbitrageurs, Putnam formed an internal "Market Timing Department" ("MTD") whose mission, ostensibly, was to prevent such occurrences. In March, 2003, the MTD issued a "Functional Narrative" that itemized many of the evils of this practice. The memo summarizes that market timing

a. Increases transaction costs associated with high levels of trading.
b. May generate unwanted taxable capital gains distributions if fund managers are forced to liquidate holdings to meet redemption needs.
c. May force fund managers to maintain higher cash positions.
d. May disrupt stated portfolio management strategies.
e. May take profits at the expense of long-term investors.

29. As required by the Investment Company Act, Putnam had adopted a code of ethics designed to obviate conflicts of interest between fund managers and the funds managed by Putnam. As described in the Statement of Additional Information for Putnam Investors Funds, dated April, 29, 2003, incorporated by reference into the prospectuses of a number of Putnam Funds, including all of Plaintiffs' Funds:

> Employees of Putnam ... and officers and Trustees of the fund are subject to significant restrictions on engaging in personal securities transactions. These restrictions are