set forth in the Codes of Ethics adopted by Putnam ... and by the fund (the Putnam Funds' Code of Ethics). The Putnam Investments' Code of Ethics and the Putnam Funds' Code of Ethics, in accordance with Rule 17j-1 of the Investment Company Act of 1940, as amended, contain provisions and requirements designed to identify and address certain conflicts of interest between personal investment activities and the interests of the fund.

The Putnam Investments' Code of Ethics ... among other things, prohibits personal securities investments without pre-clearance, imposes time periods during which personal transactions may not be made in certain securities by employees with access to investment information, and requires the timely submission of broker confirmations and quarterly reporting of personal securities transactions. Additional restrictions apply to portfolio managers, traders, research analysts and others involved in the investment advisory process.
. . . .

The fund's Trustees, in compliance with Rule 17j-1, approved Putnam Investments' and the Putnam Funds' Codes of Ethics and are required to approve any material changes to these Codes.

30.   Thus, investors in the Putnam Funds were assured that personal trading by the fund manager and its employees was being strictly monitored to avoid conflicts of interest that might be injurious to the funds. That assurance was false.

### Market Timing By Putnam Fund Managers

31.   Contrary to the representations made by Putnam concerning strict enforcement of its "Code of Ethics," at least six Putnam employees were allowed to engage in market timing or short-term trading within Putnam's Funds. At least four of the employees were portfolio managers who held decision-making authority. These individuals who market timed the very funds they managed were Justin Scott, Omid Kamshad, Geir Lode, and Carmel Peters.

32.   Beginning in at least 1998, Justin M. Scott, Omid Kamshad, Geir Lode and Carmel Peters repeatedly implemented market-timing trading of Putnam Funds in their personal accounts. Scott's trading

continued until at least mid-2000; Kamshad's trading continued into 2003. These trades were in funds in which these Putnam managers had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

33. Collectively, these four senior money managers timed traded in the following Putnam Funds:

Putnam Emerging Markets Fund (has since merged into Putnam International Equity Fund)
Putnam Asia Pacific Growth Fund (has since merged into Putnam International Equity Fund)
Putnam Asia Pacific Growth Fund II Fund(former incubated fund, has been liquidated)
Putnam International Capital Opportunities Fund (formerly Putnam International Voyager Fund)
Putnam International Equity Fund (formerly Putnam International Growth Fund)
Putnam Europe Equity Fund (formerly Putnam Europe Growth Fund)
Putnam Worldwide Equity Fund (former incubated fund, has been liquidated)
Putnam International New Opportunities Fund
Putnam International Fund 2000 (incubated fund)

34. Until 2000, at least Scott's and Kamshad's short-term trading went unchecked by Putnam altogether.

35. Putnam's most senior managers, including Putnam President and CEO Lawrence Lasser, found out about this trading in 2000. Yet they did not stop it, or disclose it.

### *Justin M. Scott's Timing Transactions*

36. Scott was chief investment officer of the international equities group at Putnam. During the relevant time period, he was a portfolio manager for at least five mutual funds whose portfolios contained international securities. By virtue of those positions at Putnam, Scott had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

37. Between 1998 and 2000, Scott engaged in approximately 35 short-term trades in Putnam Funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in

-12-

which he bought and sold mutual fund shares on consecutive days. As a result of his short-term trading, Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of mutual fund shares for his own account.

38.     On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum regarding Kamshad's short-term trading. The memorandum, which addresses a warning given to Kamshad in January 2000, made clear that short-term trading in large amounts was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds."

### *Omid Kamshad's Timing Transactions*

39.     Kamshad was chief investment officer for international equity at Putnam since early 2002. During the relevant time period, he was a portfolio manager for at least seven mutual funds whose portfolios contained international securities. By virtue of these position at Putnam, Kamshad had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders.

40.     Between 1998 and 2003, Kamshad engaged in at least 38 timing transactions in Putnam funds, including at least four funds he participated in managing. In these trades, Kamshad sold shares an average of only 13 trading days after purchasing shares in a fund and often sold shares only three or fewer trading days after purchases. Kamshad realized hundreds of thousands of dollars in gains. Kamshad typically traded hundreds of thousands of dollars worth of fund shares and, on at least one occasion, the value of his short-term trade exceeded $1 million.

41. In January 2000, senior Putnam executives in Putnam's retirement plan group learned of "large and frequent movement" of Putnam Funds by Kamshad, who at the time served as lead portfolio manager on Putnam's International Equity and Europe Equity Funds. On January 25, 2000, the director of Putnam's employee relations and staffing unit discussed with Kamshad his frequent trading, and Kamshad said he would cease that type and level of activity. On February 18, 2000, the director issued a memorandum to the file confirming this conversation.

42. Following this discussion, Kamshad continued to engage in timing transactions in Putnam Funds. Between February and April 2000, Kamshad engaged in at least nine more of these transactions.

43. Subsequently, in mid-2000, a senior executive at Putnam held a meeting with investment professionals in which he stated that Putnam employees must not engage in short-term trading in Putnam Funds. Kamshad, like other Putnam portfolio managers, attended this meeting. However, no procedures were put in place that would put a stop to such transactions. In fact, Putnam's review of managers' trading accounts was limited to one quarter per year, leaving the other 9 months totally unmonitored.

44. Therefore, Kamshad was able to continue his timing transaction activity. Between August 2000 and September 2000, he made seven more of these transactions. For example, as recently as March 2003, Kamshad purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the lead manager. Four trading days later, he sold Europe Equity shares, garnering a profit of more than $79,000. In total, Kamshad engaged in at least 20 short-term round trip trades after he was warned about his conduct.

45. The most senior managers at Putnam were aware of this activity by portfolio managers, yet did not take any disciplinary action against them, did not warn fund directors of this conduct, and did

-14-

nothing to tighten the policing of this type of activity to assure that it would not recur. Management's feeble response did nothing to deter continued misconduct.

### Market Timing By Favored Clients

46. Putnam's managers turned a blind eye not only to profiteering by its employees at the funds' expense, but also to the same type of conduct by favored clients as well – those with whom it had prospects of doing more lucrative business. Putnam allowed participants in three retirement plans to time Putnam Funds, in the expectation that such favored treatment would lead to other lucrative business opportunities for Putnam with these retirement plans and their members.

47. Although senior management of Putnam was, once again, well aware of this activity, they never made an effort to stop it, and never disclosed it to either the board or the shareholders of any of the Putnam Funds, while continuing to solicit their approval of lucrative advisory contracts.

48. In March of 2000 a Putnam review of trading activity in the Voyager Fund revealed that participants in one retirement plan, managed by Putnam, were doing a great deal of market timing transactions. In fact, by September of 2001, Putnam was receiving so many telephone trading orders from participants in the plan during between 3 and 4 p.m. that the hour became synonymous with that plan. When this information percolated up to the attention of "Putnam Retail Management," which had supposedly been organized to stamp out such trading, they refused to take any action.

49. Action in this plan's account continued at a feverish pace. So much so that, on December 6, 2002, Putnam management had determined that 28 plan participants were accounting for 99% of the exchanges in the International Voyager Fund, 99% of the International Growth Exchanges Fund, and 98% of the money market exchanges. Exchanges occur when shares in one fund are exchanged for shares in

-15-

another fund in the same family; and this is a standard mechanism for carrying out market timing transactions. The plan participants also engaged in frequent exchanges between the Voyager Fund and the Stable Value Fund from at least 2000.

50. Putnam's motivation in allowing this trading to continue was to secure other lucrative business from the plan sponsors. For example, in an e-mail dated March 17, 2003, Putnam employee Robert Gowdy explicitly stated how the scheme was instrumental in Putnam securing additional business from the retirement fund.

51. On September 11, 2003, the Commonwealth of Massachusetts sent its first subpoena regarding market timing and mutual fund practices to Putnam. Shortly thereafter, Putnam finally took action by restricting the ability of plan participants to make transfers into the Voyager Fund. It did not, however, disclose the plan's timing activities.

52. Putnam has also allowed rampant market timing by other plans' members, once again in order to secure other lucrative investment advisory business from them.

53. In early 2000, for example, Putnam Dedicated Services Representatives at the Norwood office became aware that plan participants of one such other plan were making frequent exchanges between the Putnam New Opportunity Fund or Putnam OTC Emerging Growth Fund into the Putnam Stable Value Fund. These exchanges, into and out of these funds, were attempts at market timing the funds. Once again, Putnam did nothing to stop it or advise the funds or its shareholders as to what was going on.

### The Misconduct At Putnam Is Disclosed

54. Putnam covered up the market timing of its employees and its key clients for years, and this coverup would be continuing to this day were it not for the investigations of the Commonwealth of

Massachusetts and the State of New York. It was not until October 21, 2003, that an article which appeared in the *Boston Globe* first revealed that Putnam was engaged in market timing activities.

55. Then, on October 24, the Putnam Funds disclosed the existence of these timing trades. On that day it issued a press release that stated:

> The information available to us indicates that, although Putnam's systems and procedures have been effective in detecting and stopping the vast majority of attempts to market time Putnam funds in recent years, they have not been perfect. We now know, for example, of market timing activity in at least one 401(k) client account that was detected but not stopped in a timely manner. We have also learned of market timing activity in a small number of Putnam employee retirement accounts, most of which occurred, was detected, and was stopped by management in 2000. Unfortunately, this activity involved several investment professionals who traded in their own funds. These individuals are no longer involved in the management of your funds.

The stampede out of the Putnam Funds by huge institutional investors, including many public employee pension plans, started immediately.

56. On November 3, 2003, Jeffrey W. Greenberg, Chairman and Chief Executive Officer of Marsh & McLennan Companies, Inc., the parent corporation of Putnam, announced the removal of Lawrence Lasser as President and CEO of Putnam. The four money managers who timed funds of which they were in charge – Scott, Kamshad, Lode and Peters – were taken off their money managing duties, placed on leave and are scheduled to depart Putnam. The other two Putnam employees were placed on leave.

### Putnam Funds' Trustees Are Too Conflicted To Act

57. As of December 31, 2002, there were 101 funds in the Putnam family of funds which comprise the Putnam Funds. Each of the 101 funds has a board of trustees whose function it is to oversee the conduct of the fund's business. All 101 funds are identical in this respect, with the same thirteen person

board. The members of the board and their compensation for 2002 is as follows:

| No. | Name | Position(s) at The Putnam Funds | Salary for Putnam Funds Trusteeship[1] |
|---|---|---|---|
| 1. | Jameson A. Baxter | Trustee, since 1994 | $216,750 |
| 2. | Charles B. Curtis | Trustee since 2001 | $206,250 |
| 3. | John A. Hill | Trustee since 1985; Chairman since 2000 | $388,250 |
| 4. | Ronald J. Jackson | Trustee since 1986 | $207,250 |
| 5. | Paul L. Joskow | Trustee since 1997 | $203,750 |
| 6. | Elizabeth T. Kennan | Trustee since 1992 | $204,250 |
| 7. | John H. Mullin, III | Trustee since 1997 | $210,000 |
| 8. | Robert E. Patterson | Trustee since 1984 | $211,000 |
| 9. | W. Thomas Stephens | Trustee since 1997 | $203,250 |
| 10. | W. Nicholas Thorndike | Trustee since 1992 | $204,500 |
| 11. | Lawrence J. Lasser | Trustee 1992-03 | $1,000,000 (plus annual bonus of $7,000,000 and stock) |
| 12. | George Putnam, III | Trustee since 1984; President since 2000 | $253,000 |
| 13. | A.J.C. Smith | Trustee since 1986 | $1,250,000 (plus incentive bonus of $1,250,000 and stock) |

58. As a consequence of overseeing the business conduct of the 101 Putnam Funds, the board members are too conflicted, too distracted, and too overburdened to adequately and reasonably oversee the business operation of the Putnam Funds, including, Plaintiffs' Funds. The weight of their responsibilities

---

[1] *See* Proxy for Putnam Master Income Trust, dated October 7, 2003. Lasser and Smith are paid directly for these and other services by MMIC directly. *See* Proxy for MMIC, dated May 15, 2003.

has and continues to preclude adequate oversight with regard to the conduct of the funds and the funds' contractual relationship with its investment advisor and the appropriate compensation to be paid thereunder.

## COUNT I

### (Violations of ICA § 36(b))

59. Plaintiffs incorporate by reference paragraphs 1-58.

60. Although this cause of action is brought for the benefit of Plaintiffs' Funds, plaintiffs bring it directly as shareholders under ICA § 36(b), 15 U.S.C. § 80a-35(b).

61. Section 36(b) creates a fiduciary duty on the part of all investment advisors, for the benefit of the funds they manage, in connection with the advisors' receipt of fees. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, §36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

62. ICA § 36(b), 15 U.S.C. § 80a-35(b), creates a private right of action for all fund shareholders to enforce these duties in a direct action, even though the direct beneficiary of such an action is the fund itself.

63. By permitting, condoning and not disclosing the fact that shares of Putnam Funds were being market timed by senior Putnam portfolio managers, and that favored clients were being allowed to time many of these funds systematically, Putnam breached its fiduciary duties with respect to the receipt

-19-

of compensation for services to Plaintiffs' Funds and in contravention of the ICA § 36(b), 15 U.S.C. §§ 80a-35(b).

## COUNT II

### (Violation of § 20(a))

64. Plaintiffs incorporate by reference paragraphs 1-58.

65. Although this cause of action is brought for the benefit of the Plaintiffs' Funds, plaintiff Lawrence Stigas also bring this cause of action directly, as shareholders, under § 20(a) of the ICA, 15 U.S.C. § 80(a)-20(a).

66. Section 20(a) of the ICA requires that all proxy statements issued must comply with the proxy rules issued by the Securities and Exchange Commission. SEC Rules prohibit misstatements of material facts and failures to disclose facts that render misleading the information that was actually disclosed.

67. Section 15(a) of the ICA, 15 U.S.C. § 80(a)-15(a), requires that all investment advisory contracts contain a precise description of all compensation to be paid thereunder and must be approved, initially, by a majority of fund shareholders, and that extensions of such contracts must be approved either by the directors or by the shareholders.

68. Putnam sought approval of the investment advisory contracts for the Putnam Capital Opportunities Fund from the shareholders of the fund by issuing a proxy statement to shareholders of the fund in December 2000. The proxy statement failed to disclose the rampant, systematic market timing transactions that were taking place within the Putnam Funds. Those market timing transactions served as additional compensation for Putnam which was not disclosed in the contracts or the proxy statement. By

soliciting approval through a false and misleading proxy statement Putnam violated SEC rules and § 20(a) of the ICA.

WHEREFORE, plaintiffs prays for judgment as follows:

    A.    Rescinding and/or voiding the management contracts;

    B.    Returning the management fees paid by the Plaintiffs' Funds to Putnam;

    C.    Awarding damages for violating sections 15(a) and 20(a) of the ICA.

    D.    Awarding plaintiffs their costs and expenses for this litigation, including reasonable attorneys' fees and other disbursements; and

    E.    Awarding plaintiffs such other and further relief as may be deemed just and proper under the circumstances.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: Boston, Massachusetts
       November 14, 2003

Respectfully submitted,

_/s/ Alan L. Kovacs_

Alan L. Kovacs
BB0# 278240
**LAW OFFICE OF ALAN L. KOVACS**
2001 Beacon Street
Suite 106
Boston, MA 02135
T: (617) 964-1177
F: (617) 332-1223

Stanley M. Grossman
Marc I. Gross
H. Adam Prussin
Ronen Sarraf
**POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York 10017
T: (212) 661-1100
F: (212) 661-8665

Richard J. Vita
**LAW OFFICES OF RICHARD J. VITA,
P.C.**
BBO # 510260
77 Franklin Street, Suite 300
Boston, Massachusetts 02110
T: (617) 426-6566
F: (617) 357-1612

*Attorneys for Plaintiffs*